UNITED STATES of America,
Plaintiff–Appellant,

v.

Earl BUSH, Defendant–Appellee.

No. 89–1412.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 13, 1989.

Decided Oct. 31, 1989.

Caryn Jacobs, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellant.

Richard A. Devine, Fred A. Smith, Phelan, Pope & John, Chicago, Ill., for defendant-appellee.

Before EASTERBROOK and MANION, Circuit Judges, and GRANT, Senior District Judge.*

EASTERBROOK, Circuit Judge.

Earl Bush was Press Secretary to Mayor Richard J. Daley of Chicago between 1955 and 1973. His tenure came to an unhappy end when reporters discovered that Bush was a principal in the firm that had the display advertising concession at O'Hare Airport. Bush did not disclose his role when his firm bid on the contract or when he filed a financial disclosure form the City required of senior employees. Mayor Daley fired Bush and the United States prosecuted him for mail fraud, using the "intangible rights" theory then being developed in the lower federal courts. See *United States v. Bush*, 522 F.2d 641 (7th Cir.1975), affirming his conviction. In June 1987 the Supreme Court repudiated the intangible rights doctrine, *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), and in November 1988 Congress revived it, 18 U.S.C. § 1346, added by § 7603(a) of Pub.L. 100–690, 102 Stat. 4508 (1988). Ever since *McNally* federal courts have been inundated with requests for relief by the thousands of persons convicted of depriving their employers of the intangible right to honest services.

■ Although in 1975 we thought that Bush's acts were criminal, *McNally* holds that we misunderstood the statute. If a defendant who did not commit a crime remains in custody, 28 U.S.C. § 2255 requires relief. *Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974),

* Hon. Robert A. Grant, of the Northern District of Indiana, sitting by designation.

applied to *McNally* cases by *Magnuson v. United States*, 861 F.2d 166, 167 (7th Cir. 1988). The new § 1346 could not be applied retroactively, given the Ex Post Facto Clause of the Constitution. *McNally* holds that § 1341 did not countenance the intangible rights doctrine; that numerous incorrect decisions gave notice that the inferior courts would penalize certain conduct does not mean that it lawfully could be penalized. Contra, *United States v. Berg*, 710 F.Supp. 438, 442–43 (E.D.N.Y.1989).

Section 2255 does not assist Bush, however; it authorizes relief only when a person is "in custody under sentence of a court established by Act of Congress", and Bush completed his sentence long ago. He never served a day in prison. After we affirmed the judgment, the district judge reduced the sentence to two years' probation, which Bush completed without incident. For more than a decade Bush has been free of obligations imposed by the judgment. Still he wants vindication, which he sought on the authority of the All Writs Act, 28 U.S.C. § 1651.

## I

The All Writs Act authorizes courts to issue "all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), holds that the writ of error *coram nobis* is such a writ but does not define when the "usages and principles of law" require its issuance. Federal courts that have issued or withheld the writ since 1954 have not said much about the conditions that require them to take one course or the other; the subject was not very significant, and one application for *coram nobis* per court per decade was the norm. *McNally* has given the old writ new prominence.

■ When our court took up the question in *United States v. Keane*, 852 F.2d 199 (7th Cir.1988), cert. denied, —— U.S. ——, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989), we started from the proposition that the writ has an historical meaning, which must be respected. Section 1651 preserves

rather than enlarges customary writs. In resolving ambiguities finality is the dominant principle. Claims of error do not justify continual reexamination; one full and fair proceeding is sufficient. We concluded that the writ should issue only when the petitioner suffers an ongoing legal disability, presents questions that could not have been resolved at the time of the conviction, and, if pressing a strictly legal question about the adequacy of the charges, establishes that the indictment does not state an offense. These requirements come from two sources. History limits the writ to factual questions that have not been litigated before; to the extent the contemporary writ goes further, the principles underlying the "custody" requirement of § 2255 call for some ongoing legal disability as a custody-substitute.

*Coram nobis* is a phantom in the Supreme Court's cases, appearing occasionally but only in outline. *Morgan* (1954) says that it exists, but no case since 1954 returns to the subject, and only one earlier case, *United States v. Mayer*, 235 U.S. 55, 35 S.Ct. 16, 59 L.Ed. 129 (1914), addressed the appropriate scope of the writ. Justice Clifford discussed the doctrine on circuit, see *United States v. Plumer*, 27 Fed.Cas. 561, 572–74 (1859), concluding that the writ did not exist in the federal courts. *Bronson v. Schulten*, 104 U.S. 410, 26 L.Ed. 797 (1881), holds that authority to issue the writ is substantive rather than procedural, so federal courts need not follow state practice, but does not discuss when that power exists. That's it until 1914 (the few other cases mentioning the writ did not discuss when it should issue). So the history is largely English, and the practice largely state. See Abraham L. Freedman, *The Writ of Error Coram Nobis*, 2 Temple L.Q. 365 (1935).

At common law no court could reopen its own judgments after the end of the term at which the judgment was rendered unless stringent conditions were met, and legal error was not a sufficient justification; the writ was

available to bring before the court that pronounced the judgment errors in mat-

ters of fact which had not been put in issue or passed upon and were material to the validity and regularity of the legal proceeding itself; ... for, it was said, "error in fact is not the error of the judges and reversing it is not reversing their own judgment." So, if there were error in the process, or through the default of the clerks, the same proceeding might be had to procure a reversal. But if the error were "in the judgment itself, and not in the process," a writ of error did not lie in the same court upon the judgment, but only in another and superior court. In criminal cases, however, error would lie in the King's Bench whether the error was in fact or law. The errors of law which were thus subject to examination were only those disclosed by the record, and as the record was so drawn up that it did not show errors in the reception of evidence, or misdirections by the judge, the remedy applied "only to that very small number of legal questions" which concerned "the regularity of the proceedings themselves."

In view of the statutory and limited jurisdiction of the Federal District Courts ... there would appear to be no basis for the conclusion that, after the term, these courts in common law actions, whether civil or criminal, can set aside or modify their final judgments for errors of law....

*Mayer,* 235 U.S. at 68–69, 35 S.Ct. at 19–20 (citations omitted). This description erred, if at all, on the side of liberality. Canvassing the English sources, the Harvard Law Review concluded: "The writ was ... distinctive in that it required the reconsideration of a judgment by a court which had already made a final disposition of the cause; but it cast no aspersions on the competency or finding of the court in its first judgment, for it lay only to call up facts which were unknown to the court at the time of judgment and which were not inconsistent with the record." *Note,* 37 Harv.L.Rev. 744 (1924). "[C]oram nobis is brought to correct an alleged error of fact not appearing on the record.... If the conviction was based on an error of law the only remedy was recommendation of the judges for a pardon." Comment, *Writ of Error Coram Nobis,* 11 Wis.L.Rev. 248, 249 (1936).

The writ came into being when appellate review was unavailable or severely limited in criminal cases, and when the writ of habeas corpus was available only to test the court's jurisdiction. *Coram nobis* then was the way to review convictions while the defendant languished in prison (or had been transported), and despite the strong justifications for ongoing review in such cases the writ usually was limited to review of factual blunders. Collateral review of judgments is no longer so limited. Because a person still "in custody" suffers a *continuing* deprivation, § 2255 authorizes collateral review for federal prisoners and § 2254 for state prisoners. When the custody ends so does this justification for this review—not only the justification based on policy, but also the justification based on statute. See *Maleng v. Cook,* —— U.S. ——, 109 S.Ct. 1923, 104 L.Ed.2d 540 (1989), holding that a person serving sentence B, which the judge enhanced because of conviction A, is not "in custody" on A after its term expires. Although the impetus behind § 2255 and the general expansion of collateral review may support stretching the boundaries of the writ of *coram nobis* too, it does not justify extending the writ indefinitely. A court could not say that review ought to be available perpetually, treat the "custody" requirement of § 2255 as a mistake, and go ahead with collateral review under the flag of *coram nobis* whether the defendant is in custody or not. There has to be a substitute for the "custody" requirement.

Contemporary *coram nobis* matters only after custody expires, making it appropriate to limit the writ to errors "of the most fundamental character", *Morgan,* 346 U.S. at 512, 74 S.Ct. at 253, quoting *Mayer,* 235 U.S. at 69, 35 S.Ct. at 19–20. Many courts, including ours, have understood this language—when combined with *Davis*—to expand *coram nobis* beyond its historical character and to authorize issuance of the writ on a purely "legal" ground, the failure

of the indictment to state an offense. We have not taken it as license to disregard other limitations. The Court observed, at the end of the opinion, that the writ is appropriate when "the results of the conviction may persist." 346 U.S. at 512, 74 S.Ct. at 253. It gave two examples: "Subsequent convictions may carry heavier penalties, civil rights may be affected." *Id.* at 512–13, 74 S.Ct. at 253–54, footnote omitted. (Morgan himself was in prison, serving a sentence that had been augmented as a result of the earlier conviction.) Combining this observation with the systemic interests supporting the finality of judgments and the fact that the "custody" requirement of § 2255 must be given force, we concluded in *Keane* that *coram nobis* is unavailable unless "the prisoner is [still] suffering civil disabilities unique to criminal convictions." 852 F.2d at 203. A fine at the time of conviction is not a "civil disability", and the reputational injury from conviction also does not suffice—civil judgments, too, cause loss of money and reputation, and to treat effects common to all litigation as civil disabilities would be to eliminate the custody requirement without leaving anything in its stead.

## II

Replying to Bush's petition in the district court, the United States contended that he had not satisfied the requirements established in *Keane*. He had not shown a custody-substitute; although Bush observed that his conviction limited his ability to own weapons, he did not press the point. Bush argued instead that the conviction prevented him from holding high-visibility public relations jobs, which the government maintained is a reputational injury rather than a civil disability. Bush did not contend that his conviction rested on a misapprehension of fact, and the prosecution argued that in light of *Keane* an error of law could not suffice, both because Bush thoroughly contested the intangible rights doctrine at trial and on appeal in 1975, and because the indictment stated an offense independent of the intangible rights doctrine. Given *Keane*, the government maintained, the court could not go behind the

indictment to determine whether the jury instructions allowed the jury to convict on an intangible rights theory.

The district judge issued a writ of error *coram nobis*. 1989 WL 8524, 1989 U.S. Dist. LEXIS 933 (N.D.Ill.1989). First the court reasoned that inability to obtain a job comparable to the one held at the time of conviction is a "civil disability" sufficient to support issuance of the writ, even though inability to carry a weapon is not. (Bush does not contest this latter conclusion.) Conceding that Bush's indictment may state an offense despite *McNally*, the court reviewed the record of the trial and the instructions given to the jury. After concluding that it could not be certain that this jury, on this evidence and these instructions, did *not* use the intangible rights theory as the basis of its decision, the court held that the writ must issue. It did not address the prosecutor's arguments, based on *Keane*, that it could not reopen a legal question settled between these parties in 1975 and at all events must stop with the sufficiency of the indictment.

Bush recognizes the difficulty of reconciling the district court's approach with ours in *Keane*, and he asks us to revisit the subject. *Keane* recognized that the courts of appeals disagreed about several aspects of *coram nobis* practice. Since then the courts' paths have diverged farther. The Tenth Circuit has endorsed the no-relitigation aspect of *Keane's* holding, *Klein v. United States*, 880 F.2d 250, 254 n. 1 (10th Cir.1989); see also *Moody v. United States*, 874 F.2d 1575 (11th Cir.1989) (only errors of fact that have not previously been before the court justify the writ; not citing *Keane* ), and the Third Circuit its proposition that if the indictment charges an offense it is unnecessary to examine the evidence presented to the jury, *United States v. Stoneman*, 870 F.2d 102 (3d Cir.1989). Cf. *United States v. Marcello*, 876 F.2d 1147, 1154 (5th Cir.1989) (saying that continuing civil disabilities are a necessary condition for issuing the writ); *United States v. Osser*, 864 F.2d 1056, 1059–60 (3d Cir.1988) (tending to agree). The Fourth Circuit issued a writ in a case indistinguish-

able from *Keane,* expressly rejecting our decision, although by a divided panel. *United States v. Mandel,* 862 F.2d 1067 (4th Cir.1988), cert. denied, —— U.S. ——, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989). The Sixth and Ninth Circuits have used *coram nobis* to expunge mail fraud convictions in light of *McNally* without discussing our approach to the subject. *United States v. Walgren,* 885 F.2d 1417 (9th Cir. 1989); *Allen v. United States,* 867 F.2d 969 (6th Cir.1989).

Revising *Keane* could not eliminate these conflicts among the circuits. Evidently the Supreme Court thinks this conflict tolerable for the time being. Keane sought review of our decision; the Solicitor General sought review of *Mandel* and acquiesced in Keane's petition for certiorari in light of the conflict. Nonetheless, the Supreme Court denied both petitions. Eventually these disputes must be put to rest. Two ambiguous decisions on the subject (*Mayer* and *Morgan* ) in the history of the Supreme Court are inadequate, tellingly so now that *McNally* has put this formerly quiescent corner of the law under pressure.

Nothing other courts have written after *Keane* persuades us that when resolution comes, it should be on terms other than those *Keane* proposes. None of the other circuits has taken issue with our reading of the history of the writ, with the need for a custody-substitute if the limitations in § 2255 are to retain force, or with the systemic interests in finality. Only the Fourth Circuit's opinion in *Mandel,* among the decisions going the other way, even mentions *Keane,* and then only to condemn it without explanation. (The Ninth Circuit's opinion in *Walgren* cites *Keane,* but only for the irrelevant proposition that *Keane* does not hold that *McNally* isn't retroactive. Our legal analysis of *coram nobis* does not receive mention.) Until shown by more cogent argument the error of our ways, we shall adhere to *Keane.* See also, e.g., *United States v. Barber,* 881 F.2d 345 (7th Cir.1989); *Toulabi v. United States,* 875 F.2d 122, 123–24 (7th Cir.1989).

■ The United States challenges the district court's approach to each element of the course *Keane* charts. Because inability to obtain high-visibility PR work is not a "civil disability", we reverse the judgment without considering the other aspects of the district court's analysis.

■ Bush is under no legal disability of which a court may relieve him. Any obstacle in the path of his preferred career is of private origin. Although the conviction injures his reputation, which in turn reduces his prospects for high-profile employment, the *facts* would remain no matter what a court did. Bush concealed his ownership; Mayor Daley fired him; he was convicted under the law in force at the time (and in force again today). A writ of error *coram nobis* does not rewrite history, could not alter circumstances suggesting to prospective employers that Bush is untrustworthy (or can be embarrassed by his past). Although a court could vacate the judgment of conviction, which might affect the probability that some employers would engage him, it could not absolve Bush of the charge of crime. To say that the jury did not necessarily conclude that in 1973 Bush committed the crime of mail fraud (as the Supreme Court understood that crime in 1987) is not to say that Bush did not commit mail fraud or some other crime in 1973 by concealing his ownership. *Coram nobis* cannot vindicate a defendant; it can only correct the record books.

Difficulty in obtaining a desirable job is not a legal disability. When taking a guilty plea, the judge does not advise the defendant that among the consequences of the plea is reduced esteem in the eyes of the community, with effects on one's career. Cf. *United States v. George,* 869 F.2d 333 (7th Cir.1989). Indeed, reputation for abiding by the law is neither "liberty" nor "property" for constitutional purposes, so a state may call someone a "known shoplifter" without offering process of any kind. *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). We concluded in *Perry v. FBI,* 781 F.2d 1294, 1302 (7th Cir.1986) (en banc), that libel without the creation of a "legal barrier" to future employment does not deprive the victim of liberty or property. Bush suffers from no

such barrier. (Of course a judgment of conviction deprives a defendant of liberty, but Bush received ample process before his conviction.)

Bush maintains that his injury extends beyond diminution of reputation. It is not that former friends shun him and employers make inferior offers; it is rather that doors have been barred in his entire line of work, which he characterizes as "media consultant and political strategist". Liberty of occupation receives greater protection than the choice of a job within a profession. E.g., *Schware v. Board of Bar Examiners*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). See *Bigby v. City of Chicago*, 766 F.2d 1053, 1057–58 (7th Cir.1985). Reputational injury falls most heavily on those who prefer high-visibility positions, those in which a servant's unsavory background can embarrass an employer. It does not follow, however, that high-visibility positions are a distinct occupation. Bush does not claim that all positions in consulting and public relations work are closed to felons; he maintains only that the ones he yearns for are not available. As we observed in *Bigby*, 766 F.2d at 1057:

> To be a policeman is to follow a particular calling, and to be excluded from that calling is an infringement of liberty of occupation. But a particular rank in the police force is not an occupation, just as the army is not a series of separate occupations, ranging from buck private to general of the armies, and just as the private practice of law is not composed of two occupations—partner and associate.... [R]anks within an occupation—head nurse versus rank-and-file nurse, for example—are not "occupations" themselves; and while preventing someone from advancing in his occupation can be a cruel deprivation, it would stretch the idea of liberty of occupation awfully far ... to treat a bar to promotion as a deprivation of that liberty.

No judgment of a federal court can give Bush entree to the plum positions in his profession.

Unwillingness to hire someone for mouth-watering jobs is not a legal disability "unique to criminal convictions." *Keane*, 852 F.2d at 203. It is not a "legal disability", period. Lower-status jobs follow pratfalls of all kinds. Take away the conviction, and Bush still suffered a severe lapse of judgment that led Mayor Daley to show him the door. It is hard to recover from such humiliations. To endure a restricted occupational menu is not to suffer a civil disability.

We do not belittle Bush's loss. He may suffer greatly, spiritually and monetarily. Loss of this kind is not a satisfactory substitute for the "custody" requirement of § 2255 because (a) it is not a legal disability, and a judgment therefore may be ineffectual in redressing it, and (b) it is different in degree, and not in kind, from the reputational injury accompanying all convictions. Trying to distinguish "mere" reputational injury from the kind Bush is suffering will be difficult and unilluminating business; it is impossible to describe a tenable line between them or the facts that would place a case on one side rather than the other. And to call on judges to draw this line may be to send them on a fool's errand, close to if not beyond the borders of the Article III "case or controversy" given the uncertainty that the judicial declaration will redress the injury.

Any system of justice requires a compromise between finality and accuracy. Although in the best of all worlds every judgment would be subject to correction as new facts came to light and legal principles were refined, in a costly legal system correction is a luxury. Judicial time devoted to reexamining the decisions of 1975 subtracts from the time available to deal with the festering grievances of 1989. Belated efforts to correct judgments can reduce accuracy as well as increase it. The district judge did not say that Bush is innocent; he said that the charge is unproven. Witnesses have died; memories have failed and documents vanished. A retrial in 1990 on events of 1973—even if that would be a sensible allocation of judicial and prosecutorial time in light of other pending disputes—would be much less reliable on questions of fact even if more reliable on questions of law. These and other consid-

erations support the doctrines of finality that pervade the legal system. Ongoing custody justifies relaxation, but the duration of reexamination is fixed by the duration of custody. A civil judgment that Bush defrauded the City of Chicago would be beyond recall today, although the injury to Bush's career might be as great. Unless courts insist on a substantial legal disability as a substitute for the "custody" requirement, they disserve the interests that have led to the finality doctrines that govern the legal system. Bush is under no significant legal disability, and revisiting a judgment that became final in 1976 was improvident.

REVERSED.