**UNITED STATES of America, Plaintiff,**

v.

**Irving L. GOTTLIEB, and J. Howard Segal, Defendants.**

**No. 79 CR 279.**

United States District Court, N.D. Illinois, E.D.

June 5, 1990.

---

3. CCC disputes the facts as well, but this court may not resolve factual disputes on a motion for summary judgment.

James P. Flessner, U.S. Attorney's Office, Chicago, Ill., for plaintiff.

Brent D. Stratton, Tuite, Mejia & Giacchetti, P.C., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

ALESIA, District Judge.

In the wake of the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), defendants Irving L. Gottlieb ("Gottlieb") and J. Howard Segal ("Segal") filed motions to vacate their respective convictions under the mail fraud statute, 18 U.S.C. § 1341. The mail fraud statute contains two elements: the existence of a scheme to defraud and the use of the mails in furtherance of that scheme. *See* 18 U.S.C. § 1341. In *McNally*, the Supreme Court held that the mail fraud statute applies only to alleged schemes to defraud the citizenry of property rights, and that schemes to defraud the citizenry of its intangible rights to the honest management of government affairs do not fall within the ambit of the mail fraud statute. *McNally*, 483 U.S. at 356, 107 S.Ct. at 2879–80.[1] Relying on *McNally*, Gottlieb and Segal now argue that because their mail fraud convictions were based on the "intangible rights" theory, they were convicted of conduct that does not constitute a violation of the mail fraud statute. Accordingly, Gottlieb and Segal request that this Court vacate their convictions and issue writs of error coram nobis pursuant to 28 U.S.C. § 1651(a). For the reasons set forth below, we deny Gott-

---

1. The *McNally* rule must be applied retroactively where defendants collaterally attack their convictions. *Magnuson v. United States*, 861 F.2d 166, 167 (7th Cir.1988).

lieb and Segal the coram nobis relief that they now seek.

## I. FACTS

In late 1978, the grand jury returned an indictment charging Gottlieb and Segal, as well as others, with various violations of the mail fraud statute. The indictment arose out of the activities of Gottlieb and Segal in directing the Community Currency Exchange Association of Illinois, Inc. ("the Association"). According to the indictment, the Association claimed tax-exempt status while accumulating a secret cash fund which Gottlieb and Segal used illegally to influence public officials. In April, 1980, Gottlieb pleaded guilty to Counts IX and X of the indictment, and Segal pleaded guilty to Counts I and V.[2] Each count realleges and incorporates Count I, which describes the mail fraud scheme relevant to the motion before us.

Paragraph 7 of Count I of the indictment describes the fraudulent scheme according to two general objectives:

(1) To defraud the State of Illinois, its citizens, its public officers, including members of the Illinois General Assembly, its public employees, its departments, agencies and boards of their right to have the State's business and the State's legislation conducted honestly and impartially, and in accordance with the laws of Illinois, as the same should be conducted, free from deceit, fraud, corruption, misconduct, bribery, improper and undue influence, dishonesty, malfeasance and unlawful impairment and obstruction; and

(2) To defraud the Illinois Department of Revenue and the IRS of the full, honest and complete information as to the true nature, purposes and operations of the Association in the application for and maintenance of its tax-exempt status through the concealment of the collection, existence and expenditures of its secret cash fund.

Paragraph 6 of Count I describes the rules which regulate organizations claiming tax-exempt status:

(a) An organization recognized by the Internal Revenue Service (hereinafter, IRS) as tax-exempt is required to file an annual federal return (IRS Form 990—Return of Organization Exempt From Income Tax) which identifies gross income, receipts and disbursements.

(b) A tax-exempt organization is required by IRS regulations to maintain accurate permanent books and records showing specifically the items of gross income, receipts, and disbursements.

(c) By operation of Illinois law, an organization exempt from federal tax is automatically exempt from state tax, and is not required to file state tax returns.

(d) The defendant ASSOCIATION filed IRS Forms 990 annually as a tax-exempt organization.

The remaining paragraphs of Count I elaborate on the details of the fraudulent scheme. According to paragraph 12 of Count I, the Association received kickbacks from fees paid to its directors and collected funds from Association members to create a secret cash fund of over $100,000 per legislative session. Paragraphs 14 and 23 of Count I further allege that the secret cash fund was not recorded in the books and records of the Association and that Gottlieb and Segal concealed the fund from the IRS and the Illinois Department of Revenue ("IDR"). Finally, paragraph 8 of Count I asserts that the intent of the scheme was to financially benefit Gottlieb and Segal, the currency exchanges they personally owned and operated, and the currency exchange industry and its members.

In the respective plea agreements of Gottlieb and Segal, each of them indicated that he pleaded guilty to the mail fraud

---

**2.** The government agreed to dismiss the remaining counts of the indictment in exchange for the guilty pleas.

allegations "because he [was] in fact guilty of the fraudulent scheme and activities described in the indictment...." (Gottlieb Plea Agreement at ¶ 10; Segal Plea Agreement at ¶ 10). Following Gottlieb's guilty plea, the Court fined him $2,000 and sentenced him to a term of fourteen months imprisonment followed by a five-year period of probation. Following Segal's guilty plea, the Court fined him $1,000 and gave him a suspended five-year prison term followed by a five-year period of probation. Both Gottlieb and Segal completed their respective sentences and now request that this Court vacate their mail fraud convictions and issue writs of error coram nobis.

## II. DISCUSSION

■ A writ of error coram nobis allows a federal court to correct a fundamental error and vacate judgment in a criminal case where a defendant already has served his entire sentence. *United States v. Morgan*, 346 U.S. 502, 512–13, 74 S.Ct. 247, 253–54, 98 L.Ed. 248 (1954); *See* 28 U.S.C. § 1651(a).[3] The Seventh Circuit defined the scope of the writ of error coram nobis in *United States v. Keane*, 852 F.2d 199 (7th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989). Before a court can provide coram nobis relief, the petitioner must establish "that the claim could not have been raised on direct appeal, that the conviction produces lingering civil disabilities, and that the error is the type of defect that would have justified habeas corpus relief pursuant to 28 U.S.C.

3. Writs of habeas corpus allow similar court action when the defendants are still in custody. 28 U.S.C. § 2255.

4. Gottlieb and Segal argue that the test articulated in *Keane* is unduly restrictive. Whether we agree with these contentions or not is immaterial. This Court is bound to follow the rulings and authority of the Seventh Circuit.

5. Gottlieb and Segal pleaded guilty to the indictment without objection to the intangible rights theory either at trial or on appeal. In an effort to satisfy the *Keane* requirement that the intangible rights issue could not have been raised on direct appeal, Gottlieb and Segal argue that they did not have a full opportunity to litigate the intangible rights issue because so many others, including Keane, had already litigated the issue with adverse results. We note that the Seventh

§ 2255." *United States v. Doe,* 867 F.2d 986, 988 (7th Cir.1989) (citing *Keane,* 852 F.2d at 203).[4] In order for a writ of error coram nobis to issue, a petitioner must satisfy all three of these requirements, as failure to establish even one of them is an independently sufficient reason to deny the writ. *Keane,* 852 F.2d at 206.

Here, the government does not contest the question of whether the intangible rights issue could have been raised on appeal, nor do the parties dispute whether this challenge can be raised in a collateral attack on a conviction.[5] The disputed issues in this action are: 1) whether either Gottlieb or Segal suffers lingering civil disabilities sufficient to justify a writ of error coram nobis; and 2) whether the indictment contains a defect which would have justified Section 2255 relief; that is, whether the indictment states an offense sufficient under *McNally.* We answer each of these questions in the negative.

### A. *Lingering Civil Disabilities*

■ The Seventh Circuit fully articulated the lingering civil disabilities requirement when it reviewed the history of the writ of error coram nobis and compared it to habeas corpus relief in *United States v. Bush,* 888 F.2d 1145–46 (7th Cir.1989). In *Bush,* the court noted that collateral review pursuant to Section 2255 applies to persons still in custody because they suffer a continuing deprivation of liberty. *Bush,* 888 F.2d at 1145–46. When custody ends, however, habeas corpus relief becomes unavail-

Circuit recently excused a defendant's failure to object to the intangible rights theory because every court of appeals that had addressed the intangible rights issue had endorsed it prior to *McNally. Bateman v. United States,* 875 F.2d 1304, 1308 (7th Cir.1989). This Court does not presume that the *Bateman* analysis fulfills the *Keane* requirement that a defendant establish that the intangible rights issue could not have been raised on appeal. Indeed, Keane himself litigated the matter fully at trial and on appeal, even though his objections to the intangible rights doctrine were ineffectual. *Keane,* 852 F.2d at 201. The resolution of this undisputed question is unnecessary to our holding today. Accordingly, this Court refrains from expressly ruling on this matter.

able, and a writ of error coram nobis provides the only means of collateral review. *Bush*, 888 F.2d at 1146–47. In order to prevent the writ from being expanded indefinitely, coram nobis relief requires a substitute for the custody requirement of Section 2255. *Bush*, 888 F.2d at 1148. Accordingly, the writ of error coram nobis is only appropriate when "the results of the conviction may persist." *Bush*, 888 F.2d at 1148 (quoting *Morgan*, 346 U.S. at 512, 74 S.Ct. at 253). Phrased otherwise, based on the historical purpose of the writ, the interests in the finality of judgments, and the force to be given the custody requirement of Section 2255, coram nobis relief is only available to those petitioners who " 'still suffer civil disabilities unique to criminal convictions.' " *Bush*, 888 F.2d at 1148, (citing *Keane*, 852 F.2d at 203).[6] Thus, we must determine whether Gottlieb and Segal have lingering civil disabilities which warrant coram nobis relief under *Keane*. We analyze the alleged civil disabilities of Gottlieb and Segal separately.

### 1. Gottlieb

■ Gottlieb's motion for coram nobis relief can be resolved summarily. On June 10, 1988, several months after filing this motion, Gottlieb died; consequently, he no longer suffers civil disabilities as a result of his conviction. Nor does Gottlieb's estate have standing under *Keane* to clear his name or to recover fines paid by Gottlieb for his arguably wrongful conviction. *See United States v. Kerner*, 895 F.2d 1159, 1163 (7th Cir.1990). In *Kerner*, the Seventh Circuit held that a petitioner's interest in being free of any lingering civil disabilities is personal and cannot survive his death. *Kerner*, 895 F.2d at 1163.[7] Accordingly, we deny Gottlieb's motion on this basis alone.

### 2. Segal

Segal lists several civil disabilities which he claims satisfy the *Keane* requirement. Specifically, Segal mentions the possibility of enhanced penalties for future convictions, the potential for impeachment during testimony at a trial, and his inability to obtain an Illinois currency exchange license and a California lottery retailer license. We address each of these contentions in turn.

■ First, Segal contends that the possibility of enhanced penalties for future convictions is a lingering civil disability that justifies coram nobis relief. It is true that in *Keane*, the Seventh Circuit stated that the possibility of enhanced penalties for future offenses *may* be a civil disability which *may* justify "a fresh look at the conviction." *Keane*, 852 F.2d at 203 (emphasis added). Nevertheless, no courts using the *Keane* analysis actually have granted the writ of error coram nobis based on the potential of enhanced penalties alone. Indeed, as Segal himself noted, *all* individuals with criminal convictions face the possibility of enhanced penalties for future convictions. Thus, to allow the possibility of future enhanced penalties to warrant coram nobis relief would make the civil disability requirement of no effect. This the Seventh Circuit has declined to do. *See Bush*, 888 F.2d at 1148 (quoting *Morgan*, 346 U.S. at 512–13, 74 S.Ct. at 253–54) (Seventh Circuit quoted the Supreme Court's observation that subsequent heavier penalties are disabilities that may persist as a result of convictions, and Seventh Circuit discussed the lingering civil disability requirement at length without further mention of enhanced penalties).

In this case, Segal no more than mentions that he faces the possibility of en-

---

**6.** Segal submits additional authority from the Ninth Circuit for our consideration of its "adverse consequences" analysis. The Seventh Circuit mentioned Segal's proffered authority when it compared the various circuits' different approaches to the writ of error coram nobis. *See Bush*, 888 F.2d at 1149 (citing *United States v. Walgren*, 885 F.2d 1417 (9th Cir.1989)). The Seventh Circuit recognized these different approaches and explicitly declared its adherence

to the *Keane* analysis. *See Bush*, 888 F.2d at 1149. Consequently, we do not consider Segal's submission in our analysis.

**7.** While an estate may successfully petition for a writ of error coram nobis to collect a state pension for the defendant's widow, we have no such circumstance here. *See, e.g., Craig v. United States*, 703 F.Supp. 730, 735 (N.D.Ill.1989).

hanced penalties for future convictions. He does not allege that an enhanced penalty is imminent, nor does he provide binding authority to support the proposition that a possible enhanced penalty in the future, without more, is sufficient under *Keane* as a lingering civil disability.[8] We do not hold that the possibility of enhanced penalties for future convictions is never sufficient as a lingering civil disability. Indeed, *Keane* indicates that such may be the case in certain situations. *Keane*, 852 F.2d at 203. We only assert that in circumstances such as those before us, the mere mention of the possibility of enhanced penalties in the future is not sufficient under *Keane* as a lingering civil disability.

■ As another lingering disability, Segal cites possible impeachment should he participate as a witness in a trial. Lingering civil disabilities, however, must be "unique to criminal convictions" to satisfy the *Keane* requirement. *Bush*, 888 F.2d at 1148 (quoting *Keane*, 852 F.2d at 203). Reputational injury from the conviction, therefore, does not suffice as a civil disability, as civil judgments also cause loss of reputation. *See Bush*, 888 F.2d at 1148. This premise applies with equal force to possible impeachment at trial. Civil liability may also give rise to a later basis for impeachment as a witness, particularly if the civil liability involved dishonesty or fraud. In any event, a writ of error coram nobis may not relieve Segal from possible impeachment. *Bush*, 888 F.2d at 1149. A writ of error coram nobis can only "correct the record books;" it cannot erase the charge of mail fraud to which Segal pleaded guilty. *See Bush*, 888 F.2d at 1149. It is certainly conceivable that at some point in the future, a court might require Segal, as a witness at trial, to honestly answer questions regarding previous guilty pleas even if his actual conviction were vacated. Thus, the possibility of impeachment is not

a sufficient civil disability under *Keane* to justify coram nobis relief.

■ Finally, Segal contends that his inability to obtain an Illinois currency exchange license and a California lottery retailer license is a civil disability caused by his conviction. The *Keane* court listed the inability to hold occupational licenses as a possible civil disability attached to criminal convictions. *Keane*, 852 F.2d at 203. The court there denied the writ, however, because Keane admitted that he was under no civil disability at the time he sought coram nobis relief. Although Keane's conviction initially resulted in disbarment, the Illinois Supreme Court eventually readmitted Keane to practice. *See Keane*, 852 F.2d at 203–04.

After *Keane* was decided, however, another court confronted the issue of whether the inability to obtain an occupational license sufficed as a *Keane* civil disability. *See Craig*, 703 F.Supp. at 734. In *Craig*, the court reasoned that *Keane* allowed "a petitioner [to] seek relief from the prospective prohibitions of state occupational regulations...." *Craig*, 703 F.Supp. at 734. The court listed several Illinois statutes that prohibited persons convicted of a felony from serving in certain occupational capacities or obtaining occupational licenses. *Craig*, 703 F.Supp. at 734. The court did not evaluate the connection between the statutes and the petitioner's alleged disabilities. *See Craig*, 703 F.Supp. at 734 (court merely listed, *inter alia*, statute providing for license for slaughtering animals and statute providing for license to run raffle as possible civil disabilities for petitioner who previously served as a legislator). Rather, the court indicated that the inability to hold any occupational licenses at all was sufficient under *Keane* as a civil disability. *Craig*, 703 F.Supp. at 734. This

---

**8.** One court has interpreted the language in *Keane* to allow a petitioner to seek relief from the possibility of an enhanced sentence in the future. *Craig*, 703 F.Supp. at 734 (Duff, J.). The court disagreed with the government's contention that future disabilities are insufficient to justify the issuance of a writ under *Keane*. *Craig*, 703 F.Supp. at 734. The *Craig* court

granted the writ based on several employment-related disabilities, but did *not* include the possibility of an enhanced penalty in its analysis. *Craig*, 703 F.Supp. at 734. Thus, the court's enhanced penalty language is dicta and is not controlling authority. *See generally United States v. Crawley*, 837 F.2d 291 (7th Cir.1988).

holding seemingly negated the *Keane* civil disability requirement, as every individual convicted of violating the mail fraud statute could successfully allege an inability to obtain any occupational license as a civil disability in order to satisfy *Keane*.

The civil disability requirement came back to life, however, when the Seventh Circuit analyzed coram nobis relief in the context of occupations in *Bush*. There, the court held that the petitioner's inability to obtain a high-visibility public relations job was not a civil disability under *Keane*. The court reasoned that "[d]ifficulty in obtaining a desirable job is not a legal disability." *Bush*, 888 F.2d at 1149. While a complete bar from an occupation may justify coram nobis relief, the choice of a job within a profession does not. *See Bush*, 888 F.2d at 1150. In sum, "[t]o endure a restricted occupational menu is not to suffer a civil disability." *Bush*, 888 F.2d at 1150.

Based on *Bush*, then, the determinative issue here is whether Segal's inability to obtain an Illinois currency exchange license or a California lottery retailer license is a bar to Segal's entire occupation, or whether it merely bars Segal from the choice of a job within a profession. While Segal currently is unable to operate an Illinois currency exchange, the fact that he was in the currency exchange business before his conviction is not dispositive.[9] In fact, the district court in *Bush* issued a writ of error coram nobis partially because of Bush's inability to obtain a job comparable to the job he held at the time of his conviction. On appeal, however, the Seventh Circuit reversed the district court's holding. *See Bush*, 888 F.2d at 1151. Moreover, while

Segal mentions his inability to obtain an Illinois currency exchange license, he does not live in Illinois, nor does he allege business pursuits in Illinois. Indeed, Segal barely presses the issue beyond mere mention. Under these circumstances, we conclude that Segal's inability to obtain an Illinois currency exchange license is not a bar to an occupation pursued by him and, therefore, is not a civil disability sufficient under *Keane*.

The alleged civil disability Segal does press is his inability to obtain a California lottery retailer license. As Segal describes it, his current check-cashing corporation would obtain a substantial economic benefit from such a license by increasing the number of customers who patronize the business and produce non-lottery revenue. According to Segal's own description, a lottery license would *add to* an already existing occupation, namely, Segal's check-cashing business. Under the present circumstances, therefore, Segal's inability to obtain a lottery license only restricts his occupational menu; it does not bar him from an occupation altogether.[10] This is not a sufficient civil disability under *Keane*. *See Bush*, 888 F.2d at 1150.

Moreover, a writ of error coram nobis may not redress this purported disability effectively. *See Bush*, 888 F.2d at 1149–50. Even if we granted coram nobis relief, the government's charge of mail fraud and Segal's guilty plea would remain matters of public record based on this opinion alone. Consequently, Segal's history may prevent him from acquiring a lottery license in California despite our ruling on the conviction.[11] Given the uncertainty

9. We note, however, that Segal's current business pursuit involves a service he provided through his currency exchange operation, namely, check-cashing.

10. Segal contends that his expenditure of substantial time and money in pursuit of a lottery license contributes to his civil disability. He submits, however, a letter from the California State Lottery which indicates that the lottery refunded his application expenses. The letter also indicates that the California Lottery *may* deny any applicant who has been convicted of a felony in the past; it does *not* state that this

occurs automatically as Segal and his attorney contend. This brings into question whether Segal's conviction necessarily prevents him from obtaining a lottery license in California, although his attorney's affidavit asserts that such is the case. Even if California automatically denies its lottery licenses to persons convicted of a felony, our holding remains unaffected.

11. Additionally, the letter from the California State Lottery indicates that it already knows of Segal's conviction. The California State Lottery may deny Segal his lottery license based on that

that coram nobis relief will redress Segal's disability, we conclude that Segal's inability to obtain a California lottery retailer license is the kind of reputational injury described in *Bush* which does not warrant the issuance of a writ of error coram nobis. *See Bush*, 888 F.2d at 1150. Although we deny coram nobis relief to both Gottlieb and Segal based on the absence of lingering civil disabilities, we go on to analyze the question of whether the indictment against them stated an offense sufficient under *McNally*.

### B. *Indictable Offense Under McNally*

■ Habeas corpus relief is triggered when an indictment fails to state an offense and an individual is convicted and punished for an act that the law does not make criminal. *Doe*, 867 F.2d at 988 (quoting *Davis v. United States*, 417 U.S. 333, 346, 94 S.Ct. 2298, 2305, 41 L.Ed.2d 109 (1974)). Gottlieb and Segal contend that the indictment against them does not state an offense because it charges them with defrauding the citizenry and the State of Illinois of intangible rights, an act not now cognizable under *McNally*. *See McNally*, 483 U.S. at 356, 107 S.Ct. at 2879–80. In support of their claim, Gottlieb and Segal point to the general objectives of the scheme described in the indictment as enumerated above.[12]

Yet, as stated in *United States v. Wellman*, 830 F.2d 1453, 1463 (7th Cir.1987), "*McNally* prescribes more than a rule of pleading." A court must look past the indictment's legal characterization of a scheme and determine whether the "specific conduct alleged in the indictment is clearly proscribed by the mail fraud statute." *Wellman*, 830 F.2d at 1463. In fact, the substantive allegations in an indictment may be cognizable under *McNally* even if the indictment is couched in "intangible rights" language. *See United States v. Bailey*, 859 F.2d 1265, 1275–76 (7th Cir. 1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989); *see also Bateman v. United States*, 875 F.2d 1304, 1309 (7th Cir.1989) (same reasoning applies to a conviction based on a guilty plea because by pleading guilty, defendant admits factual allegations in the indictment). Thus, "if the indictment states an offense, that is the end of things for relief in the nature of coram nobis." *Keane*, 852 F.2d at 205.[13]

■ In this case, although the general objectives of the indictment clearly characterize Gottlieb's and Segal's fraudulent scheme in terms of intangible rights, we find that the indictment nonetheless alleges a scheme to defraud the IRS and the IDR of property within the meaning of *McNally*. The indictment expressly states that Gottlieb and Segal, as well as their co-defendants, devised the scheme to financially benefit themselves, their currency exchange operations, and the currency exchange industry as a whole. According to the indictment, Gottlieb and Segal collected and maintained the secret fund, failed to record it in the Association's books and records, and generally concealed its use from the IRS and the IDR. The indictment further alleges that Gottlieb and Segal specifically used the mails to execute their

---

knowledge alone, whether or not we vacate his conviction.

12. The government essentially concedes that the portion of the indictment alleging a deprivation of the citizens' right to honest government fails under *McNally*. At issue here is only the portion of the indictment asserting the concealment of the secret fund from the IRS and the IDR. If this latter charge is sustainable under *McNally*, the conviction will stand even if the indictment addresses both tangible and intangible rights. *See United States v. Bonansinga*, 855 F.2d 476, 478–79 (7th Cir.1988).

13. We note that *Keane* requires that courts examine only the indictment under a coram nobis analysis. Other courts, however, have looked beyond the indictment to plea agreements, jury instructions and evidence admitted at trial. *See e.g., United States v. Ginsburg*, 705 F.Supp. 1310, 1316 (N.D.Ill.1989) (court cited pre-*Keane* case to justify its examination of the indictment and jury instructions to determine whether the defendant was convicted of an offense under *McNally*). Although we deem it unnecessary, an examination of the plea agreements of Gottlieb and Segal reveals only that Gottlieb and Segal pleaded guilty to the relevant mail fraud counts because they were in fact guilty of the fraudulent scheme described in the indictment. Our analysis, therefore, necessarily centers on the indictment alone.

fraudulent scheme and to conceal the secret fund from the IRS and the IDR for the purpose of financial gain. Based on these allegations, we find that the indictment sufficiently sets forth a scheme to defraud the IRS and the IDR of money or property within the meaning of *McNally*.[14]

Nevertheless, Gottlieb and Segal argue that because a loss of tax revenue did not necessarily result from the false information filed by Gottlieb and Segal, the indictment does not allege a scheme to defraud the IRS and the IDR of money or property. In support of their argument, Gottlieb and Segal cite the decision in *United States v. Gimbel*, 830 F.2d 621 (7th Cir.1987). There, the Seventh Circuit determined that an indictment did not state an offense under *McNally* where the indictment described a scheme to deprive the Treasury Department of accurate information which might have resulted in an assessment of tax deficiencies, but did not allege a scheme to deprive the government of money or property. *Gimbel*, 830 F.2d at 626. Relying on *Gimbel*, Gottlieb and Segal contend that an indictment which charges a defendant with "interfering with the IRS's proper ascertainment and collection of income taxes ... does not specifically allege that he deprived the government of revenue." *United States v. Eckhardt*, 843 F.2d 989, 996–97 (7th Cir.1988), *cert. denied*, 488 U.S. 839, 109 S.Ct. 106, 102 L.Ed.2d 81 (1988).[15] According to Gottlieb and Segal, "[t]he connection between the charged conduct and the loss of revenue

here is too tenuous and speculative to constitute an actual deprivation of money or property." *Eckhardt*, 843 F.2d at 997.

Gottlieb and Segal's reliance on *Gimbel* and *Eckhardt* is unavailing for several related reasons. First, the court in *Gimbel* vacated the petitioner's conviction because the indictment lacked any language which pertained to a purpose or scheme to deprive the government of money. *See Gimbel*, 830 F.2d at 626–27. In *Eckhardt*, however, the Seventh Circuit denied coram nobis relief because the indictment there described a fraudulent scheme to obtain money and property by false representations. *Eckhardt*, 843 F.2d at 997. While the *Eckhardt* court inferred from the indictment that the defendant sought to falsely obtain money and property from taxpayer-investors instead of the IRS, the court arguably would have sustained the portion of the indictment relating to taxes "had the indictment specifically alleged that the government was defrauded of money or property...." *United States v. Bucey*, 876 F.2d 1297, 1310 (7th Cir.) *cert. denied*, —— U.S. ——, 110 S.Ct. 565, 107 L.Ed.2d 560 (1989) (Seventh Circuit analysis of *Eckhardt* ). Furthermore, in *Bucey*, which was decided after *Gimbel* and *Eckhardt*, the Seventh Circuit recently endorsed the proposition that an indictment which *alleges a purpose* to defraud the government of tax revenues is sufficient under the "money or property" requirement of *McNally*. *Bucey*, 876 F.2d at 1310 (Seventh Circuit endorsing such

**14.** The allegation of Gottlieb and Segal's intent does not incorporate that portion of the indictment which describes Gottlieb and Segal's fraudulent use of the IRS Forms 990. The allegation of intent *does* incorporate, however, the contention that Gottlieb and Segal concealed the use of the secret fund from the IRS and the IDR. Thus, our holding remains unaffected. In addition, as the indictment indicates, Illinois law provides for tax-exempt status to organizations exempt from federal tax. The Association's state tax-exempt status, therefore, resulted as a consequence of its federal tax-exempt status. Although Gottlieb and Segal did not file fraudulent information with the IDR, we find that they concealed the secret fund from that department via their fraudulent use of the federal forms.

**15.** Gottlieb and Segal also cite *United States v. Gottlieb*, No. 79 CR 279 (N.D.Ill. Nov. 25, 1987), wherein Allen Eager, a co-defendant, obtained a writ of error coram nobis. Eager's conviction involved the same indictment at issue here. The court vacated the conviction on the ground that the indictment did not state an offense under *McNally*. While normally this case might be dispositive of the issue now before us, we find that the court which ruled on Eager's petition in the earlier *Gottlieb* case did not have the benefit of the *McNally* analyses available to us today under *Eckhardt* and *United States v. Bucey*, 876 F.2d 1297 (7th Cir.) *cert. denied*, —— U.S. ——, 110 S.Ct. 565, 107 L.E.2d 560 (1989). If it had, the court which ruled on Eager's petition may have decided that case differently. We therefore refrain from using *Gottlieb* as precedent.

reasoning in *United States v. Regan*, 699 F.Supp. 36, 40 (S.D.N.Y.1988) (emphasis added)). Accordingly, because the indictment against Gottlieb and Segal alleges a purpose of financial gain via a scheme which involved fraudulent representations to the IRS and the IDR, we find that the indictment suffices under the "money or property" requirement of *McNally.*

Additionally, the Seventh Circuit in *Bucey* made clear that the mail fraud statute punishes the *scheme* to defraud; thus, "the ultimate success of the fraud and the actual defrauding of a victim are not necessary prerequisites to a successful mail fraud prosecution." *Bucey*, 876 F.2d at 1311 (emphasis in original); *accord Keane*, 852 F.2d at 205. It is true that in *Gimbel*, the Seventh Circuit earlier declined to express any view regarding the validity of indictments alleging schemes that had not reached fruition and in which no loss of money or property resulted. *See Gimbel*, 830 F.2d at 627 n. 3. Nevertheless, later on in *Bucey*, the Seventh Circuit specifically addressed this issue after a review of its holdings in *Gimbel* and *Eckhardt*, and endorsed the view that a putative monetary detriment satisfied the *McNally* requirement. *Bucey*, 876 F.2d at 1309–10 (quoting *Regan*, 699 F.Supp. at 40). The actual defrauding of the government, therefore, is not necessary to uphold an indictment which alleges a scheme to defraud the government. *See Bucey*, 876 F.2d at 1311. Consequently, the fact that Gottlieb and Segal's indictment did not allege that the IRS or the IDR actually lost or would have lost tax revenue does not warrant vacation of either Gottlieb's or Segal's conviction. *See Bucey*, 876 F.2d at 1311.

Moreover, the potential property loss sufferable by the IRS and the IDR in this case is not so speculative as to mandate coram nobis relief. Paragraph 12 of the indictment clearly charges that the secret fund consisted of over $100,000 per legisla-tive session. Thus, the indictment alleges that Gottlieb and Segal concealed $100,000 per legislative session through their fraudulent use of the IRS Forms 990 with the intent to produce financial gain for themselves and their currency exchange businesses; any tax owing on that amount of money can be "readily identif[ied]." *See United States v. Folak*, 865 F.2d 110, 114 & n. 2 (7th Cir.1988) (court found that some money or property loss was readily identifiable where defendants either pocketed a portion of money or helped themselves to a portion of the business' inventory or both, and where the state *presumably* lost money under one of the counts in the indictment) (emphasis added).

In addition, the potential property loss alleged here is no more speculative than the property loss alleged in *Doe.* There, the indictment charged the defendant with reducing property tax assessments. *Doe*, 867 F.2d at 988–89. The Seventh Circuit upheld the conviction because the indictment alleged a scheme to defraud the county of property within the meaning of *McNally. Doe*, 867 F.2d at 989. Although it is conceivable that a reduction in tax assessments may not *necessarily* cause a decrease in tax liability, under these circumstances, the court inferred that the county in fact lost tax revenue. *See Doe*, 867 F.2d at 989. Similarly, this Court concludes that given the alleged intent to gain financial benefits, the fraudulent use of the IRS Forms 990 presumably caused loss of tax revenue assessable against the more than $100,000 per legislative session concealed by Gottlieb and Segal.

Finally, it is well established that the mail fraud statute protects governmental bodies as long as the protection encompasses property rights. *See McNally*, 483 U.S. at 358 n. 8, 107 S.Ct. at 2881 n. 8.[16] Governments have a property interest in their collected and uncollected tax revenues. *See Doe*, 867 F.2d at 989 (where the Seventh Circuit cited several Illinois stat-

---

**16.** In *Gimbel*, the Seventh Circuit left open the issue of whether a scheme to deprive the government of tax dollars is cognizable under *McNally. Gimbel*, 830 F.2d at 627 n. 3. The court later concluded in *Bucey* that *McNally* "does not foreclose a mail fraud conviction based on a scheme to defraud the federal government of income taxes." *Bucey*, 876 F.2d at 1310 n. 24.

utes demonstrating a governmental property interest in collected or uncollected tax revenues); *Manning v. Seeley Tube & Box Co.*, 338 U.S. 561, 566, 70 S.Ct. 386, 389, 94 L.Ed. 346 (1950) ("Congress intended the United States to have the use of money lawfully due when it became due.") A scheme to defraud the government of property is not invalid merely because the government's property interest in tax revenue does not vest until a tax deficiency is declared. *See Bucey*, 876 F.2d at 1310 (quoting *Regan*, 699 F.Supp. at 40). It is irrelevant whether the government has a vested property interest during the life of the scheme. *Bucey*, 876 F.2d at 1310 (quoting *Regan*, 699 F.Supp. at 40). Rather, the relevant issue is whether the government would be deprived of revenue if the alleged scheme was brought to fruition. *Bucey*, 876 F.2d at 1310 (quoting *Regan*, 699 F.Supp. at 40). Under *Bucey*, if an alleged scheme, when brought to fruition, would deprive a government of tax revenues, the connection between the challenged conduct would not be "too tenuous ... to constitute an actual deprivation of money or property." *See Eckhardt*, 843 F.2d at 997.[17]

The indictment here charges Gottlieb and Segal with a scheme to fraudulently conceal the secret fund from the IRS and the IDR with the intent to gain financial benefits. We conclude that the alleged scheme, if brought to fruition, would deprive the IRS and the IDR of property within the meaning of *McNally*. Accordingly, the indictment states an offense cognizable under *McNally* as to both Gottlieb and Segal.

## III. CONCLUSION

For the reasons outlined, this Court denies the motions of Gottlieb and Segal to vacate their respective convictions pursuant to the writ of error coram nobis, 28 U.S.C. 1651(a).

IT IS SO ORDERED.

---

**17.** The reasoning in *Bucey* also distinguishes the holding in *United States v. Riky*, 669 F.Supp. 196, 199 (N.D.Ill.1987), from the case at bar. *See Bucey*, 876 F.2d at 1304.