**UNITED STATES of America, Respondent,**

v.

**Robert A. LOFTUS, Petitioner.**

**No. CR 83-00186.**

United States District Court, M.D. Pennsylvania.

May 13, 1992.

Albert R. Murray, Jr., Asst. U.S. Atty., Lorna Graham, Scranton, Pa., for U.S.

Charles Gelso, Wilkes-Barre, Pa., for Robert A. Loftus.

## MEMORANDUM

NEALON, District Judge.

■ In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court rejected the application of the mail fraud statute to schemes designed to defraud citizens of their intangible right to good and honest government. *Id.*, 483 U.S. at 360, 107 S.Ct. at 2881–82 (Court limited § 1341 "in scope to the protection of property rights.") The petitioner Robert Loftus, in light of *McNally*, seeks to vacate his December 6, 1983 conviction by writ of *coram nobis*. In addition, Loftus requests the return of the $10,000 fine paid. The one count indictment, to which Loftus pleaded guilty, alleged that he willfully and knowingly conspired with one Sadie Cosgrove to sign a voter's name to an absentee ballot and then used the mails of the United States for the purpose of executing a scheme and artifice to defraud the Luzerne County Board of Elections and the voters of Luzerne County by means of false and

fraudulent pretenses and representations, contained on official absentee balloting materials cast in the May 19, 1981 Primary Election. In violation of 18 U.S.C. § 1341.

*Indictment (filed November 1, 1983).* An examination of the indictment demonstrated that it was not susceptible to a finding that an economic harm would result from Loftus' conduct. *See United States v. Asher,* 854 F.2d 1483, 1494 (3d Cir.1988) ("Essentially, ... where rights are involved whose violation would lead to no concrete economic harm, and where those rights are the only rights involved in the case, *McNally's* proscriptions would prevent upholding conviction on appeal."). Therefore, by Memorandum and Order dated January 9, 1992, this court determined that *McNally* rendered Loftus' conviction invalid inasmuch as "errors which result in a person's charge and conviction for something not a crime are fundamental[,]" *United States v. Stoneman,* 870 F.2d 102, 105 (3d Cir.1989), and that, under the circumstances then existing, the petitioner's failure to appeal from his 1983 judgment of conviction for mail fraud did not bar *coram nobis* relief. However, notwithstanding the determination that Loftus' conviction was invalid, in order to obtain complete relief under existing law, the petitioner must establish that he continues to suffer collateral consequences as a result of the conviction. Accordingly, a final decision on the petition was held in abeyance pending supplemental submissions on this issue.

### I.

Loftus filed three supplemental submissions. He enumerates several consequences attached to his mail fraud conviction, *viz.,* that he suffers under the stigma of a felony fraud conviction; that he paid a $10,000 fine; that he is ineligible for a position in city government; that he cannot possess a firearm; that he will be subjected to an enhanced sentence if convicted of another offense; that he can be impeached as a witness in a criminal or civil trial; that he cannot serve as a director or officer of a federally insured bank; and, that he cannot obtain licenses to engage in his former occupation as an insurance agent and broker. In an affidavit accompanying his first supplemental brief, Loftus declares, in pertinent part:

4. Solely as a result of my ... conviction for mail fraud, on June 3, 1985, both my insurance agent and my broker licenses were revoked and I was ordered to pay a civil penalty of $1,000.00 to the Commonwealth of Pennsylvania....

5. At the time of my ... conviction for mail fraud, I was mayor of the City of Pittston ... as well as a director and senior vice president of the First Bank of Greater Pittston and as a result of my conviction, I was forced to resign from those positions. My business as an insurance agent and broker and my employment as the mayor of the City of Pittston and as a director and vice president of the bank formed my sole source of earned income all of which I lost as a result of the ... conviction.

6. Because of the ... conviction, I am no longer eligible to run for public office and a convicted felon cannot serve as an officer or director of a federally insured bank. However, at the present time, because of my age, I would not be eligible to serve as an officer or director of the bank nor do I have any desire to seek public office.

7. Because of my status as a convicted felon, I have not applied to the Insurance Commissioner of the Commonwealth of Pennsylvania for reinstatement of my insurance agent and broker licenses. I believe and therefore aver that as long as I remained a convicted felon the Insurance Commissioner ... would deny any application for reinstatement of said licenses.

8. If my petition is granted, I will reapply to the Insurance Commissioner ... for reinstatement of my insurance agent and broker licenses and I believe and therefore aver that if my conviction is removed, my licenses will be reinstated.

9. As is apparent from the Order and Adjudication of Insurance Commissioner ..., my licenses were revoked because of the fact of my conviction for mail fraud

and not because of the conduct underlying that conviction.

*Document 24 at ¶ 4–9.*[1]

The petitioner points out that there is a dispute among the circuits with respect to what constitutes collateral consequences sufficient to warrant *coram nobis* relief and that the Third Circuit has not directly addressed this issue. The Ninth Circuit, in essence, presumes that "collateral consequences flow from any criminal conviction[,]" *Hirabayashi v. United States*, 828 F.2d 591, 606 (9th Cir.1987) (citation omitted), while the Seventh Circuit "reject[s] coram nobis petitions except where there is a concrete threat that an erroneous conviction's lingering disabilities will cause serious harm to the petitioner." *United States v. Craig*, 907 F.2d 653, 658 (7th Cir.1990). Loftus urges the court to adopt the less exacting approach of the Ninth Circuit. In the alternative, he maintains that the revocation of his licenses as a broker and an agent satisfy the stringent requirements of the Seventh Circuit.[2]

In response, the Government argues that the approach of the Seventh Circuit is the law in the Third Circuit. Applying the Seventh Circuit's criteria, the Government argues that *coram nobis* relief is unjustified. With respect to Loftus' assertion that he is ineligible for a position in city government and that he cannot serve as a director or officer of a federally insured bank, the Government maintains that, inasmuch as he is not interested in seeking such positions,[3] these factors are insufficient to satisfy the continuing consequences requirement. For a similar reason, the Government contends that the fact that he cannot possess a firearm fails to qualify as a collateral consequence since he does not allege either a desire or a need to possess a firearm. With regard to the petitioner's contentions that he will be subjected to an enhanced sentence if convicted of another offense and that he can be impeached as a witness in a criminal or civil trial, the Government asserts that such factors are speculative and that reliance thereon would undermine the civil disability requirement. Addressing Loftus' claim that he cannot obtain licenses as an insurance agent and broker, the Government advances the position that under the relevant Pennsylvania regulations, his 1983 conviction would not bar him from acquiring these licenses. Further, the Government notes that he has not reapplied for these licenses.

At the direction of the court, Loftus proffered additional submissions with respect to his prior bank position and his insurance licenses. Loftus states that the bank in which he served as a director has adopted a mandatory retirement policy. The bank, however, has "grandfathered" directors who were on the Board prior to the acceptance of the retirement policy to allow them to remain on the Board after reaching the mandatory retirement age. Contrary to Loftus' initial belief that he could not serve as a director because of his age, it appears that he could come within the scope of the "grandfather" policy and, therefore, he is now interested in such an appointment.[4]

---

1. Under the plea agreement, Loftus was required to resign as Mayor of Pittston and Chairman of the Democratic Party for Luzerne County. In addition, he agreed not to seek any public or elective office or position of public trust during his probationary period. *Plea Agreement at ¶ 12.* The plea agreement did not cause him to lose his insurance licenses, but "the status of any professional license held by [him] is not protected by [the plea agreement] and is a matter solely within the discretion of the appropriate licensing authority." *Id. at ¶ 11.* Nor did the plea agreement require him to resign as a director of the First Bank of Greater Pittson.

2. In the January 9, 1992 Memorandum and Order, the court, in granting the petitioner an opportunity to establish that he suffers from continuing penalties, noted the Seventh Circuit's application of the collateral consequences test.

3. Loftus originally stated in his affidavit that, because of his age, he is ineligible to serve as an officer or a director of a federally insured bank, *Document 24 at ¶ 6,* but as set forth *infra,* he now alleges that he is eligible.

4. Loftus offered the letter of Thomas Burke, the current Chairman of the First Bank Regional Board. The letter provides:

This letter will serve to confirm that Mr. Loftus would be eligible for consideration to serve as a member of the Regional Board of First Bank, incorporated as Commonwealth

With respect to the insurance licenses, Loftus acknowledges that his conviction does not constitute *prima facie* evidence of unfitness under the Pennsylvania insurance regulations since it is more than five years old. Nonetheless, as the Insurance Commissioner holds a "great deal of discretion", Loftus argues that the Insurance Department "is much more likely to grant reinstatement ... if he comes before the Department out from under the yoke of his unlawful conviction for conspiracy to defraud." *Document 27 at ¶ 2–3.*[5] In addition, Loftus maintains that he

> will not seek reinstatement of his insurance licenses because he reasonably anticipates that if local media holds true to form, his application would bring with it the type of publicity and heartache that attended his prosecution. Obviously, under those circumstances, the denial of his application would create another waive [*sic*] of publicity and heartache.

*Id. at 3.*

The Government responds that the facts underlying Loftus' conviction will always exist and that granting *coram nobis* relief does not assure Loftus of becoming a director or obtaining his insurance licenses. The pleadings have been closed, and the petition is ripe for disposition. For the

reasons that follow, the petition will be granted.

## II.

In the aftermath of *McNally*, the writ of *coram nobis* has attained newfound importance.[6] As the Seventh Circuit Court of Appeals observed, however, "[c]oram nobis is a phantom in the Supreme Court's cases, appearing occasionally but only in outline. *Morgan* (1954) says that it exists, but no case since 1954 returns to the subject, and only one earlier case, *United States v. Mayer*, 235 U.S. 55 [35 S.Ct. 16, 59 L.Ed. 129] ... (1914), addressed the appropriate scope of the writ." *United States v. Bush*, 888 F.2d 1145, 1146 (7th Cir.1989).

In *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), the petitioner Morgan pleaded guilty to a federal charge in the District Court for the Northern District of New York in 1939. Morgan was given, and then served, a four year sentence. In 1950, Morgan was convicted by a New York state court on a state charge and sentenced to a longer term because the 1939 federal conviction qualified him as a second offender. Morgan, who was incarcerated in a state prison, filed a petition for *coram nobis* in the District Court for the Northern District of New

---

Bank, should his conviction be overturned, which is the successor (by merger) to the Board on which Mr. Loftus served. Although the retirement age for new members of the Board is age 65, several members who are relatively the same age as Mr. Loftus (and who previously served with him) have continued to serve on the Board as a result of a "grandfather provision" with respect to those members—extending their eligibility to serve for an additional period of time beyond the normal retirement age.

Should Mr. Loftus' conviction be overturned, he would be eligible to be considered for a Board seat whereupon his name would be submitted to the Nominations, Compensation and Benefits Committee of the Board of Commonwealth Bancshares, Inc. which is the parent corporation of the Bank. Thereafter, Mr. Loftus may or may not receive a recommendation and appointment to serve on the Board.
*Document 29.*
By affidavit, Charles Gelso, Loftus' attorney, avers that Mr. Burke "advised [him] that unless Mr. Loftus' conviction is vacated, Mr. Loftus

will not be considered eligible for consideration to serve as a member of the Regional Board of First Bank." *Document 31 at ¶ 2.* Mr. Burke's representations were not challenged by the Government.

5. Loftus' assertion is supported by a letter from Linda Wells, Chief Counsel to the Pennsylvania Insurance Department, wherein she states:

A felony conviction for conspiracy to commit mail fraud would adversely impact an application for licensure in that it could result in license denial. Although it is inappropriate to prejudge the resolution of any specific application, the existence of felony convictions are considered material to the Department's evaluation of worthiness to hold an agent's or broker's license.
*Document 29.*

6. For a discussion of the writ of *coram nobis* and its application after *McNally* see M. Diane Duszak, Note, *Post–McNally Review of Invalid Convictions Through the Writ of Coram Nobis*, 58 FORDHAM L. REVIEW 979 (1990).

York. He sought to vacate the 1939 judgment of conviction on the ground that, without competent waiver, he was not provided with counsel.

The Supreme Court concluded that the District Court had the power to vacate Morgan's 1939 conviction. *Id.* at 511, 74 S.Ct. at 252. The Court cautioned, however, that "[c]ontinuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice." *Id.* The Court continued:

> In the *Mayer* case this Court said that *coram nobis* included errors "of the most fundamental character." Under the rule of *Johnson v. Zerbst,* 304 U.S. 458, 468 [58 S.Ct. 1019, 1024–25, 82 L.Ed. 1461 (1938) ], decided prior to [Morgan's] conviction, a federal trial without competent and intelligent waiver of counsel bars a conviction of the accused. Where it cannot be deduced from the record whether counsel was properly waived, we think, no other remedy being then available and sound reasons existing for failure to seek appropriate earlier relief, this motion in the nature of the extraordinary writ of *coram nobis* must be heard by the federal trial court. Otherwise a wrong may stand uncorrected which the available remedy would right. Of course, the absence of a showing of waiver from the record does not of itself invalidate the judgment. It is presumed the proceedings were correct and the burden rests on the accused to show otherwise.
>
> Although the term has been served, the results of the conviction may persist. Subsequent convictions may carry heavier penalties, civil rights may be affected. As the power to remedy an invalid sentence exists, we think [Morgan] is entitled to an opportunity to attempt to show that this conviction was invalid.

*Morgan,* 346 U.S. at 512–13, 74 S.Ct. at 253 (internal footnotes and citations omitted).

Courts of Appeals, in the dearth of case law, have extrapolated from *Morgan* the prerequisites of the writ and have generally required an invalid conviction that resulted from a fundamental error as well as continuing disabilities to the petitioner from the defective conviction. *See United States v. Stoneman,* 870 F.2d 102, 105–106 (3d Cir.1989) (writ of *coram nobis* "is used to attack allegedly invalid convictions which have continuing consequences, when the petitioner has served his sentence and is no longer 'in custody' for purposes of 28 U.S.C.A. § 2255. The petitioner must show that he is suffering from continuing consequences of the allegedly invalid conviction.") (citing *Morgan,* 346 U.S. at 512–13, 74 S.Ct. at 253); *United States v. Marcello,* 876 F.2d 1147, 1154 (5th Cir.1989) ("*Coram nobis* is appropriate only where the petitioner can demonstrate that he is suffering civil disabilities as a consequence of the criminal convictions and that the challenged error is of sufficient magnitude to justify the extraordinary relief.") (citations omitted); *United States v. Keane,* 852 F.2d 199, 203 (7th Cir.1988) (petitioner "must demonstrate that the judgment of conviction produces lingering civil disabilities" and that "the error is the type of defect that would have justified relief during the term of imprisonment."); *United States v. McClelland,* 941 F.2d 999, 1002 (9th Cir. 1991) (the requirements to qualify for *coram nobis* are " '(1) a more usual remedy is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.' ") (citation omitted). With respect to the collateral consequences component of the *coram nobis* test, the Courts of Appeals have adopted divergent standards,[7]

---

7. The court notes that the Courts of Appeals do not always agree on what errors are sufficient to warrant *coram nobis* relief. *Compare United States v. Martinez,* 905 F.2d 709, 715 (3d Cir. 1990) ("we have repeatedly held that the mere presence of intangible rights theory language in an indictment or jury charge does not in and of itself require the overturning of a previous conviction.") *with United States v. Mandel,* 862 F.2d 1067, 1073 (4th Cir.1988) ("Whatever the rule

and the Fourth and Sixth Circuits have granted *coram nobis* relief without discussing the requirement of collateral consequences.[8]

### III.

As the petitioner recognizes, the Court of Appeals for the Third Circuit requires collateral consequences in addition to a fundamental error for *coram nobis* relief. The question presented here is whether he has advanced sufficient continuing consequences to grant *coram nobis* relief. In *United States v. Osser*, 864 F.2d 1056 (3d Cir.1988), the Court of Appeals stated:

> [I]t appears to us that an assertion that a conviction was based on conduct not covered by a criminal statute class is of a "fundamental character." *See Davis v. United States*, 417 U.S. 333, 346–47 [94 S.Ct. 2298, 2305–06, 41 L.Ed.2d 109] ... (1974).
>
> Even so, other factors must be taken into account. The interest in finality of judgments is a weighty one that may not be casually disregarded. Where sentences have been served, the finality concept is of an overriding nature, more so than in other forms of collateral review such as habeas corpus, where a continuation of confinement could be manifestly unjust.
>
> *Morgan* indicated that coram nobis relief is not available if a sentence has been executed unless the conviction carries continuing penalties. *Morgan*, 346 U.S. at 512–13 [74 S.Ct. at 253].... The collateral consequences that must exist to justify coram nobis have been the subject of some discussion among the Courts of Appeals. For example, we noted in [*U.S. v.*] *Cariola* [, 323 F.2d 180 (3rd Cir.

1963)] that the denial of the right to vote or the subsequent imposition of a sentence heavier than would otherwise have been appropriate represents a collateral legal disadvantage that survives the satisfaction of a sentence. *Cariola*, 323 F.2d at 182.

> In *United States v. Keane*, 852 F.2d 199, 203 (7th Cir.1988), the Court of Appeals stated that the collateral consequences must be unique to criminal convictions, for example, the loss of a license to practice law, or of the right to bear arms. However, the Court viewed a fine that had been paid as equivalent in reality to a money judgment in a civil case, and hence, not sufficient to sustain a coram nobis action. Damage to reputation is not enough. However, in *Hirabayashi v. United States*, 828 F.2d 591, 606 (9th Cir.1987), the Court seemed to adopt a presumption that "collateral consequences flow from any criminal conviction." In that case, the Court found the requirement was satisfied even on a misdemeanor.

*Osser*, 864 F.2d at 1059–60.

In the *Osser* case, the petitioner contended that, as a consequence of his mail fraud conviction, he was denied a pension from the City of Philadelphia. The Court observed:

> We admit to some uncertainty that Osser has established the requisite showing of collateral consequences but the record on appeal is almost nonexistent and the government has conceded the point for purposes of appeal. We are not completely satisfied that the prerequisites for coram nobis may be established by prosecutorial concession in this fashion. *See Mayer*, 235 U.S. at 70 [35 S.Ct. at

---

may be elsewhere, we hold that in a case in which the jury considers alternate theories of liability, we must reverse the convictions if either theory is an improper basis for punishment.") and *Moody v. United States*, 874 F.2d 1575, 1577 (11th Cir.1989) ("A claim of newly discovered evidence relevant only to the guilt or innocence of the petitioner is not cognizable in a coram nobis proceeding.") (footnote omitted) *with Hirabayashi v. United States*, 828 F.2d 591, 603–604 (9th Cir.1987) (new material demonstrating that the Department of War suppressed evidence from the petitioner and the Justice

Department at the time the petitioner's case was presented to the Supreme Court may have affected reasoning of the Supreme Court and may be considered in a *coram nobis* proceeding).

**8.** The Courts of Appeals for the Tenth and Eleventh Circuits have denied writs of *coram nobis* without addressing collateral consequences. *See Klein v. United States*, 880 F.2d 250 (10th Cir.1989); *Moody v. United States*, 874 F.2d 1575 (11th Cir.1989).

20].... However, in view of the result we reach here, we will assume, without deciding, that Osser has established the loss of a pension and that it is a cognizable collateral consequence.

*Osser,* 864 F.2d at 1060 (footnote omitted).[9] The Court then denied *coram nobis* relief because Osser had not appealed his conviction.

■ Therefore, a *coram nobis* petitioner in the Third Circuit "must show that he is suffering continuing consequences of the allegedly invalid conviction." *Stoneman,* 870 F.2d at 106 (citation omitted). As indicated in *Osser,* however, the Court of Appeals, while noting that the issue of collateral consequences is a "subject of some discussion among the Courts of Appeals," did not express its view as to what would be necessary to constitute sufficient collateral consequences to justify *coram nobis* relief. Upon a review of the cases addressing collateral consequences, the court finds that Loftus suffers adequate continuing consequences to warrant *coram nobis* relief.

## IV.

As the *Osser* Court noted, the Ninth Circuit apparently presumes the existence of collateral consequences. In *Hirabayashi v. United States,* 828 F.2d 591 (9th Cir. 1987), the petitioner filed a writ of *coram nobis* to vacate two misdemeanor convictions.[10] The Court of Appeals for the Ninth Circuit rejected the position that the petitioner Hirabayashi must establish specific legislative disabilities.

The *Sibron* [*v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968)] opinion creates no such requirement. This is reflected in our *coram nobis* decisions which consistently apply the *Sibron* "*no* possibility of *any* collateral legal consequences" test. *See, e.g., Cha-*

vez *v. United States,* 447 F.2d 1373, 1374 (9th Cir.1971) (per curiam); *Byrnes v. United States,* 408 F.2d 599, 601 (9th Cir.), *cert. denied,* 395 U.S. 986 [89 S.Ct. 2142, 23 L.Ed.2d 775] ... (1969). We have repeatedly reaffirmed the presumption that collateral consequences flow from any criminal conviction. *See, e.g., Byrnes,* 408 F.2d at 601. As we stated in *Holloway, coram nobis* relief is available to prevent manifest injustice "even where removal of a prior conviction will have little present effect on the petitioner." *Holloway v. United States,* 393 F.2d 731, 732 (9th Cir.1968).

*Hirabayashi,* 828 F.2d at 606 (emphasis in original).

The Ninth Circuit, in *United States v. Walgren,* 885 F.2d 1417 (9th Cir.1989), again noted its "liberal presumption" that collateral consequences result from any criminal conviction and that the burden to disprove the presumption rests on the government. *Id.* at 1421. The *Walgren* Court then determined that the government failed to demonstrate that the petitioner would not suffer collateral consequences in light of the possibility that he may suffer from enhanced criminal penalties if convicted of another offense and may be impeached if he testified in court.

More fundamentally, however, it cannot be said that the existence of an additional felony conviction, even if it does not affect a defendant's criminal history category [under the United States Sentencing Guidelines], will have no possible adverse consequence in the sentencing judge's sentence within the guideline range. More than a possibility exists that the existence of an additional felony conviction will militate against a sentence at the lower end of the guideline range. *See* 18 U.S.C. § 3553(c)(1) (court must state its reasons "for imposing a sen-

9. In a footnote, the Court stated that "we need not, and do not decide here that the possibility of heavier punishment in the event of a conviction in the future may be a cognizable collateral consequence." *Osser,* 864 F.2d at 1060 n. 3.

10. In 1942, the petitioner, a Japanese–American, was living in Seattle and was subject to wartime orders requiring all individuals of Japanese an-

cestry to remain in their residences between 8:00 p.m. and 6:00 a.m. In addition, the petitioner was required to report to a Civilian Control Station for processing for exclusion from the military area. The petitioner did not obey the curfew or report to a Civilian Control Center.

tence at a particular point within the [guideline] range"). Thus, the possibility exists that Walgren might suffer an adverse consequence if his mail fraud (or RICO) conviction is left standing.

Further, Walgren may be impeached should he ever testify in court because the mail fraud conviction was based on a scheme to defraud.

*Walgren*, 885 F.2d at 1422 (citation omitted).

In *United States v. Marcello*, 876 F.2d 1147 (5th Cir.1989), the Fifth Circuit Court of Appeals, upon finding that the conduct described in the indictment did not constitute a violation of the mail fraud statute, granted the petitioner Roemer *coram nobis* relief. The Court stated that *coram nobis* is "appropriate only where the petitioner can demonstrate that he is suffering civil disabilities as a consequence of the criminal convictions and that the challenged error is of sufficient magnitude to justify the extraordinary relief." *Id.* at 1154 (citations omitted). Although noting the collateral consequences requirement, the Court did not identify the continuing disabilities suffered by Roemer but remarked that "[o]n appeal the government does not challenge the propriety of the use of this writ." *Id.* The Court held:

> In this case, Roemer appealed his case at each stage in the proceedings and, being denied all relief, served his sentence. The only meaningful remedy available to him is that provided by the writ of *coram nobis*. *McNally* makes clear that Roemer was indicted and convicted under the RICO statute for conduct which is not a federal offense. He sought relief promptly after *McNally*. Accordingly, he must be absolved of the consequences flowing from his branding as a federal felon.

*Marcello*, 876 F.2d at 1154 (internal footnote omitted).

One year later, the Court of Appeals in *United States v. Bruno*, 903 F.2d 393 (5th Cir.1990), found that the petitioner established a fundamental error but remanded for a specific determination on collateral consequences. *Id.* at 396. It appears from *Marcello* and *Bruno* that the Court of Appeals for the Fifth Circuit requires collateral consequences but, like the Ninth Circuit Court of Appeals, takes a lenient approach.

In *United States v. Mandel*, 862 F.2d 1067 (4th Cir.1988), the Fourth Circuit Court of Appeals granted *coram nobis* relief without explicitly raising the issue of collateral consequences. The Court began its analysis with *Morgan.*

> The [*Morgan*] Court held that the extraordinary remedy should be issued, however, "only under circumstances compelling such action to achieve justice." An error "of the most fundamental character" must have occurred to warrant issuing the writ, and no other remedy may be available. We follow the Second Circuit, which, in an opinion by Judge Friendly, has specifically allowed the granting of a writ of error *coram nobis* in light of a retroactive dispositive change in the law of mail fraud. *United States v. Travers*, 514 F.2d 1171 (2d Cir. 1974).
>
> The petitioners in this case have served their sentences. They appealed their cases at each stage of the proceeding. They have no other remedy available other than a writ of error *coram nobis*. Based on the Supreme Court's ruling in *McNally*, the jury instructions in this case improperly allowed petitioners' convictions for acts which are not within the reach of the mail fraud statute.

*Mandel*, 862 F.2d at 1075 (internal citation omitted).

The Court continued:

> Petitioners were tried and convicted under § 1341 and, thus, also of prohibited racketeering activities under 18 U.S.C. §§ 1961 *et seq.* for acts the Supreme Court has held are not within the reach of the federal mail fraud statute. Without *coram nobis* relief, the petitioners, who contested their guilt at each stage of the proceeding, would face the remainder of their lives branded as criminals simply because their federal trial had occurred before rather than after the Supreme Court's ruling in *McNally*.

*Id.* (citation and footnote omitted). In a footnote, the *Mandel* Court, quoting from *Parker v. Ellis*, 362 U.S. 574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960), remarked: "Conviction of a felony imposes a *status* upon a person which not only makes him vulnerable to future sanctions through new civil disability statutes, but which also seriously affects his reputation and economic opportunities." *Id.* at 593–94, 80 S.Ct. at 919–20 (Chief Justice Warren dissenting).

While *Mandel* does not speak in terms of collateral consequences, the Court's observation that the petitioners would be "branded as criminals" without *coram nobis* relief aligns the Fourth Circuit with the Ninth Circuit. In essence, the *Mandel* Court, like the *Hirabayashi* Court, presumes that consequences collateral to an invalid conviction exist.[11]

In contrast to the Fourth, Fifth and Ninth Circuits, the Seventh Circuit has taken a restrictive stance on the question of collateral consequences. In *United States v. Keane*, 852 F.2d 199 (7th Cir.1988), the Court restricted the availability of *coram nobis* relief to situations in which the petitioner suffers from civil disabilities unique to criminal convictions. *Id.* at 203. The petitioner Keane had been disbarred after his conviction, and the Court acknowledged that "this sort of civil disability could support issuance of the writ." *Id.* Keane, however, was readmitted to practice in 1984. Inasmuch as Keane was no longer under any civil disability, and there was "no realistic threat that Keane's conviction could produce any disability or detriment in the future[,]" *id.* at 203–204, the Court decided that relief was inappropriate. The Court remarked that the "conviction is a black mark, but that is not a civil disability, and we decline to adopt the Ninth Circuit's apparent view that anyone may obtain *cor-*

*am nobis* just to bask in the satisfaction of having his position vindicated." *Id.* at 204 (citation omitted).[12]

In *United States v. Bush*, 888 F.2d 1145 (7th Cir.1989), the Court of Appeals concluded that "[d]ifficulty in obtaining a desirable job is not a legal disability." *Id.* at 1149. The petitioner Bush averred that his conviction prevented him from holding high-visibility public relations positions. The Court stated:

> Bush is under no legal disability of which a court may relieve him. Any obstacle in the path of his preferred career is of private origin. Although the conviction injures his reputation, which in turn reduces his prospects for high-profile employment, the *facts* would remain no matter what a court did. Bush concealed his ownership; Mayor Daley fired him; he was convicted under the law in force at the time (and in force again today). A writ of error *coram nobis* does not rewrite history, could not alter circumstances suggesting to prospective employers that Bush is untrustworthy (or can be embarrassed by his past). Although a court could vacate the judgment of conviction, which might affect the probability that some employers would engage him, it could not absolve Bush of the charge of crime.

*Id.* (emphasis in original).[13]

Still later, the Court, in *United States v. Craig*, 907 F.2d 653 (7th Cir.1990), stated that

> the types of disabilities sufficient to justify coram nobis relief can be broken down into three elements. First, the disability must be causing a present harm; it is not enough to raise purely speculative harms or harms that occurred completely in the past. Second, the disability must arise out of the erroneous convic-

---

11. *See also Allen v. United States*, 867 F.2d 969 (6th Cir.1989). Unlike *Mandel*, which made an oblique reference to collateral consequences, the Court of the Appeals for the Sixth Circuit in *Allen* affirmed the district court's granting of *coram nobis* relief without any discussion of collateral consequences.

12. In addition, the Court found that the return of a fine is a permissible remedy, but that the

possibility of getting money back is not enough by itself to warrant *coram nobis* relief. *Keane*, 852 F.2d at 204 (citations omitted).

13. Bush, who was Mayor Daley's Press Secretary between 1955 and 1973, was a principal in the firm that had the display advertising concession at O'Hare Airport. Bush failed to disclose his role in the firm when it bid on the contract.

tion. Third, the potential harm to the petitioner must be more than incidental. *Id.* at 658 (internal footnote omitted). The Court pointed to *United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954), as an "excellent example of a disability justifying *coram nobis* relief...." *Craig,* 907 F.2d at 658. In *Morgan,* the petitioner actually received an enhanced sentence as a consequence of a previous federal conviction, which the petitioner alleged was invalid.

The *Craig* Court observed that the Third Circuit has "hinted that it might follow our more restrictive view." *Craig,* 907 F.2d at 659, citing *Osser,* 864 F.2d at 1060. In addition, the Court rejected the Ninth Circuit's reliance on *Sibron* to support its less restrictive view, stating:

> The [Supreme] Court was discussing the showing that a criminal defendant must make to prevent his case from becoming moot on direct appeal, and a direct appeal does not present the same finality concerns that arise on a petition for a writ of error coram nobis. The *Sibron* Court only held that the completion of the sentence does not render a criminal appeal moot ..., and its decision is inapposite to the issue in this case. Clearly, the completion of sentence does not render a coram nobis petition moot, for that is the only time that such a petition can be brought. The issue here is not mootness but what conditions justify the expenditure of judicial resources to grant the extraordinary writ of error *coram nobis.*

*Craig,* 907 F.2d at 659 n. 3 (internal citation omitted).[14]

In *Sibron v. New York,* 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), the Supreme Court examined its mootness precedents. The petitioner Sibron was convicted in New York state court on the basis of evidence seized from his person. Sibron appealed his conviction to the Supreme Court, asserting that § 180–a of New York's "stop-and-frisk" statute was uncon-

stitutional. Before the Court decided the case, Sibron completed service of his six month sentence.

In addressing the question of whether the matter had thereby become moot, the Supreme Court stated:

> The second exception recognized in *St. Pierre* [*v. U.S.,* 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943)] permits adjudication of the merits of a criminal case where "under either state or federal law further penalties or disabilities can be imposed ... as a result of the judgment which has ... been satisfied." 319 U.S.[ ] at 43 [63 S.Ct. at 911].... *St. Pierre* implied that the burden was upon the convict to show the existence of collateral legal consequences. Three years later in *Fiswick v. United States,* 329 U.S. 211 [67 S.Ct. 224, 91 L.Ed. 196] (1946), however, the Court held that a criminal case had not become moot upon release of the prisoner, noting that the convict, an alien, might be subject to deportation for having committed a crime of "moral turpitude"—even though it had never been held (and the Court refused to hold) that the crime of which he was convicted fell into this category. The Court also pointed to the fact that if the petitioner should in the future decide he wanted to become an American citizen, he might have difficulty proving that he was of "good moral character." *Id.*[ ] at 222 [67 S.Ct. at 230].

The next case which dealt with the problem of collateral consequences was *United States v. Morgan,* 346 U.S. 502 [74 S.Ct. 247, 98 L.Ed. 248] (1954). There the convict had probably been subjected to a higher sentence as a recidivist by a state court on account of the old federal conviction which he sought to attack. But as the dissent pointed out, there was no indication that the recidivist increment would be removed from his state sentence upon invalidation of the federal conviction, *id.*[ ] at 516[ ] n. 4 [74

14. With the exception of *Morgan,* the cases cited in *Sibron* involved direct appeals in which the sentences were served before the cases reached the Supreme Court. In *Parker v. Ellis,* 362 U.S.

574, 80 S.Ct. 909, 4 L.Ed.2d 963 (1960), cited by the *Sibron* Court, the petitioner sought *habeas corpus* relief. Before the case reached the Supreme Court, the petitioner was released.

S.Ct. at 255 n. 4], and the Court chose to rest its holding that the case was not moot upon a broader view of the matter. Without canvassing the possible disabilities which might be imposed upon Morgan or alluding specifically to the recidivist sentence, the Court stated:

"Although the term has been served, the results of the conviction may persist. Subsequent convictions may carry heavier penalties, civil rights may be affected. As the power to remedy an invalid sentence exists, we think, respondent is entitled to an opportunity to attempt to show that this conviction was invalid." *Id.*[ ] at 512–513 [74 S.Ct. at 253].

Three years later, in *Pollard v. United States*, 352 U.S. 354 [77 S.Ct. 481, 1 L.Ed.2d 393] (1957), the Court abandoned all inquiry into the actual existence of specific collateral consequences and in effect presumed that they existed. With nothing more than citations to *Morgan* and *Fiswick*, and a statement that "convictions may entail collateral legal disadvantages in the future," *id.*[ ] at 358 [77 S.Ct. at 484], the Court concluded that "[t]he possibility of consequences collateral to the imposition of sentence is sufficiently substantial to justify our dealing with the merits." *Ibid. The Court thus acknowledged the obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences.* The mere "possibility" that this will be the case is enough to preserve a criminal case from ending "ignominiously in the limbo of mootness." *Parker v. Ellis*, 362 U.S. 574, 577 [80 S.Ct. 909, 911, 4 L.Ed.2d 963 (1960) ] (dissenting opinion).

*Sibron*, 392 U.S. at 53–55, 88 S.Ct. at 1897–99 (internal footnotes omitted) (emphasis supplied).

The Court then went on to find that Sibron's case survived the mootness test.

Without pausing to canvass the possibilities in detail, we note that New York expressly provides by statute that Sibron's conviction may be used to impeach his character should he choose to put it in issue at any future criminal trial, N.Y.Code Crim.Proc. § 393–c, and that it must be submitted to a trial judge for his consideration in sentencing should Sibron again be convicted of a crime, N.Y.Code Crim.Proc. § 482. There are doubtless other collateral consequences.

*Sibron*, 392 U.S. at 55–56, 88 S.Ct. at 1899.[15]

Further, the Court remarked that "it is far better to eliminate the source of a potential legal disability than to require the citizen to suffer the possibly unjustified consequences of the disability itself for an indefinite period of time before he can secure adjudication of the State's right to impose on it the basis of some past action." *Id.* at 57, 88 S.Ct. at 1899 (citation omitted). As such, the Court stated that "*St. Pierre v. United States* ... must be read in light of later cases to mean that a criminal case is moot only if it is shown that there is no possibility that any collateral legal consequence will be imposed on the basis of the challenged conviction." *Sibron*, 392 U.S. at 57, 88 S.Ct. at 1900.

In *Osser*, the Third Circuit Court of Appeals, recognizing that a direct appeal and a petition for *coram nobis* may present different concerns, stated:

The interest in finality of judgments is a weighty one that may not be casually disregarded. Where sentences have been served, the finality concept is of an overriding nature, more so than in other forms of collateral review such as habeas corpus, where a continuation of confinement could be manifestly unjust.

*Osser*, 864 F.2d at 1059.

Although *Osser* acknowledges that the interest in finality may be stronger in a

---

**15.** In a footnote, the Court noted that there is a clear distinction between a general impairment of credibility, to which the Court referred in *St. Pierre*, see 319 U.S.[ ] at 43, 63 S.Ct. at 911, and New York's specific statutory authorization for use of the conviction to impeach the "character" of a defendant in a criminal proceeding. The latter is a clear legal disability deliberately and specifically imposed by the legislature.
*Sibron*, 392 U.S. at 56 n. 17, 88 S.Ct. at 1899 n. 17.

*coram nobis* proceeding than on direct appeal, it should be noted that the mootness question may be intertwined with the availability of *coram nobis* inasmuch as it affects a court's jurisdiction over the petition. In *United States v. Cariola*, 323 F.2d 180 (3d Cir.1963), the petitioner served a 24 hour sentence in 1938 after pleading guilty to a "technical violation" of the Mann Act. The petitioner withdrew his earlier plea of not guilty and entered a "technical plea of guilty" upon the advice of the District Judge and his attorney. In 1962, the petitioner filed a petition for writ of *coram nobis* in which he contended that he did not intelligently, understandingly or competently enter his guilty plea.

The Court of Appeals first addressed the Government's assertion that the case was moot.

> It is true that the petition on its face presents no justiciable controversy. Although the petition alleges that the plea was not entered competently or understandingly and was never intended as a plea of actual guilt to the crime charged, the only consequence alleged is the petitioner's embarrassment and loss of prestige. This is not enough to justify a judicial determination of petitioner's rights. The moral stigma of a judgment which affects no legal rights presents no case or controversy of federal cognizance. *St. Pierre v. United States*, 319 U.S. 41 [63 S.Ct. 910, 87 L.Ed. 1199] . . . (1943).

*Cariola*, 323 F.2d at 182.

Although the petition in *Cariola* did not demonstrate a justiciable controversy on its face, the Court of Appeals noted that the

> jurisdictional deficiency of the petition . . . was cured by the proof. At the hearing the petitioner testified that he had been living in Buffalo, New York since 1954 and that because of the position of leadership which he occupied in union affairs, it was particularly important that he participate in political activities. He stated that under the laws of New York his conviction in 1938 makes it a crime for him to vote. New York Penal Law, § 510–a, which makes it a

criminal offense for a person who has been convicted of a felony to vote, has been in effect during the period of petitioner's residence in New York. See also § 152(4) of the New York Election Law. Thus, the judgment of conviction, although satisfied, has affected and continues to affect petitioner's legal rights. The validity of the conviction, therefore, is not moot. A case cannot be said to be moot when a conviction entails collateral legal disadvantages which survive the satisfaction of the sentence.

*Cariola*, 323 F.2d at 182 (citation omitted).

*Cariola*, which was decided before *Sibron*, illustrates that mootness is a relevant question in a *coram nobis* proceeding. The *Cariola* Court stated that the existence of collateral consequences would save a case from mootness. Thus, to the extent that mootness affects a federal court's jurisdiction over a petition for *coram nobis*, the court finds *Sibron* to be germane. Notwithstanding the stronger finality concerns when sentences have been served, contrary to the position of the Seventh Circuit Court of Appeals in *Craig*, *Sibron* could support the Ninth Circuit's presumption that "collateral consequences flow from any criminal conviction."

The Third Circuit Court of Appeals has noted the extraordinary nature of *coram nobis* relief. In *Stoneman*, the Court stated:

> *Coram nobis* is an extraordinary remedy, and a court's jurisdiction to grant relief is of limited scope. *Id.* "The interest in finality of judgments dictates that the standard for a successful collateral attack on a conviction be more stringent than the standard applicable on a direct appeal." [*U.S. v.*] *Gross*, 614 F.2d [365] at 368 [(1980)]. It is even more stringent than that on a petitioner seeking *habeas corpus* relief under § 2255.

*Stoneman*, 870 F.2d at 106 (citations omitted). Notwithstanding the extraordinary nature of *coram nobis* relief, as a practical matter, the court agrees with the Ninth Circuit's presumption that consequences do, in fact, attach to criminal convictions. While this court would prefer the liberal-

ized attitude of the Fourth, Fifth and Ninth Circuits, it will be assumed that our Court of Appeals would opt for the more exacting standard adopted by the Seventh Circuit. Nevertheless, the court finds that Loftus satisfies the standard utilized by the Seventh Circuit.

## V.

Applying the more demanding criteria, Loftus' contention that he is ineligible for a position in city government and that he cannot possess a firearm, does not support *coram nobis* relief inasmuch as he does not seek a public office, *Document 24 at ¶ 6*, and does not demonstrate a desire to own a firearm. In addition, the fact that he may suffer under the stigma of a felony conviction is an insufficient collateral consequence. *Cariola*, 323 F.2d at 182 (citation omitted). With respect to the possibility that he may be subjected to an enhanced sentence or may be impeached as a witness in a criminal or civil trial, without more, these "consequences" are not present disabilities, but are purely speculative. *See Craig*, 907 F.2d at 658.[16] *But see Walgren*, 885 F.2d at 1422. To afford the petitioner *coram nobis* relief on the mere specter of future disabilities would ignore the court's limited jurisdiction to grant relief and disregard the strong interest in finality of judgments.

In *Keane*, the Court of Appeals stated that loss of occupational licenses may support *coram nobis* relief. While Loftus states that he cannot obtain a license as an agent and broker, he has not reapplied for these licenses. *Document 24 at ¶ 7*. Further, Loftus concedes that under the pertinent insurance regulations, his 1983 conviction does not constitute *prima facie* evidence of unfitness. *Document 27 at ¶ 2*.

However, the letter of Linda Wells, Chief Counsel to the Pennsylvania Insurance Department, pointed out that felony convictions would "adversely impact an application" and are "considered material to the Department's evaluation of worthiness to

hold" insurance licenses. *Document 29*. Although Wells stated that "it is inappropriate to prejudge the resolution of any specific application[,]" *id.*, Loftus' reluctance to apply for reinstatement under such circumstances is understandable. The tone of Wells' letter demonstrates that, while the felony conviction remains, the chances of a favorable result are less likely. The attitude of the Insurance Commissioner, because of the fact of the conviction, is best exemplified in the June 3, 1985 Order and Adjudication, which revoked Loftus' insurance licenses, wherein it was stated:

> In evaluating all these factors, Loftus' favorable reputation is not sufficient to overcome the serious nature of his conviction and subsequent confinement and parole status. Although revocation of Loftus' insurance licenses may inflict severe consequences on him, it is not reasonable to ignore the conviction which involved a conspiracy to defraud the public and to permit Loftus to continue to represent the insurance industry to the public as an agent or broker. Loftus' conviction demonstrates that he is not worthy of either a broker's or agent's license and evidences his lack of fitness to remain so licensed. 40 P.S. §§ 233(a), 252 (Supp. 1984–85); 31 Pa.Code § 33.-7(a)(7), (b).

*Document 24 at ¶ 20–21*. The emphasis on the conviction itself is apparent. Although vacating Loftus' conviction and sentence does not assure that his application will be granted, the prior reasoning of the Commissioner indicates that, while his conviction remains of record, his chances will be markedly diminished. Finality of judgment, in an appropriate case such as this, should give way to the principle of fairness. There should be no fear that the precedent in this case might unleash a barrage of *coram nobis* petitions which would erode the finality doctrine and overburden the court's resources inasmuch as a situation such as that presented in the after-

---

**16.** In *Morgan*, the petitioner did receive an enhanced sentence as a consequence of a prior, allegedly invalid, conviction.

math of the *McNally* ruling would be extremely rare.

With respect to the petitioner's contention that he cannot serve as a director on the Regional Board of First Bank, the court finds that this disability also satisfies the collateral consequences requirement. He is suffering a present harm that is a consequence collateral to his mail fraud conviction.[17] The harm is more than incidental since Loftus' bank position,[18] with his insurance business and employment as Mayor of Pittston, provided the sole source of his earned income. *Document 24 at ¶ 5.* While the court agrees with the Seventh Circuit Court of Appeals conclusion in *Bush* that "[d]ifficulty in obtaining a desirable job is not a legal disability[,]" *Bush,* 888 F.2d at 1149, the present case is distinguishable. Loftus only seeks to serve as a bank director, a position which he lost solely as a result of his mail fraud conviction.

The Government, referring to the letter of Thomas Burke, argues that Loftus is not guaranteed a position on the Board and that he has not established that it is the conviction which prevents him from sitting on the Board. Loftus initially indicated that he was not eligible to serve as a director on the Regional Board of First Bank because of his age. *Document 24 at ¶ 6.* By letter, Thomas Burke, the current Chairman of the Regional Board of First Bank, clarified Loftus' statement. Burke states that although First Bank adopted a mandatory retirement policy,[19] it has a grandfather provision. Thus, several members on the Board, who had served with Loftus, have exceeded the mandatory retirement age and continue to serve as a result of the grandfather provision. *Document 29.*

Burke states that the petitioner would be eligible for consideration to serve on the Board if his conviction is vacated. Loftus' name would then be submitted to a Nominations Committee, which may or may not recommend and appoint him to serve on the Board. *Id.* Although the Nominations Committee need not appoint him to the Board, the court disagrees that he has failed to establish that it is the conviction that prevents him from sitting on the Board. Before he may be considered eligible for a Board position, his conviction must be vacated. *Document 31.* Hence, it is unrebutted that it is solely the petitioner's conviction that prevents the Nominations Committee from considering him for a Board position.

Inasmuch as Loftus has established that he continues to suffer from consequences collateral to his mail fraud conviction, *coram nobis* relief will be granted, and the Government will be instructed to return the $10,000 fine, which he paid as a result of that conviction. An appropriate Order will be entered.

### ORDER

NOW, this 13th day of May 1992, in accordance with the attached Memorandum, IT IS HEREBY ORDERED THAT Loftus' petition for writ of *coram nobis* is granted. The petitioner's conviction entered December 6, 1983 is vacated, and the Government is directed to return the $10,000 fine paid as a result of that conviction.

17. Loftus was not required to resign as a director of First Bank pursuant to his plea agreement with the Government. *See* note 1, *supra.* Loftus states that, although the plea agreement did not affect his position as "director and senior vice president of the First Bank of Greater Pittston ...[,] as a result of [his] conviction, [he] was forced to resign from those positions." *Document 24 at ¶ 5.* The Government does not dispute this contention.

18. The court notes that Loftus' reference to his position as senior vice president, *see supra* note 17, probably refers to his honorary title of Vice-President of the Board of Directors, which he held at the time of his conviction.

19. The retirement age is 65. At the time of the June 3, 1985 Order and Adjudication, Loftus was 66 years of age. Hence, Loftus would now be in his early seventies.